# EXHIBIT A

## CONTRACT OF SALE

**CONTRACT** (this "Contract") dated **September 6** 2023, between, NYMD Greenlake, LLC, debtor-in-possession having an office at 155-15 90th Avenue, Jamaica, New York 11432 ( herein referred to as "Seller"), and Konnectia, LLC as nominee for an entity to be formed with an address located at 1915 Harrison Street, 2nd Floor, Hollywood, Florida 33020. ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

**1.      Sale of Premises and Acceptable Title**

1.01     Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this Contract: (a) fee simple title to the property know as 605 and 609 Green Lake Road, Athens, New York 12414 , as more particularly described in Schedule "A" attached hereto (collectively, "Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; (e) all developmental and air rights now or hereafter a part of the Land; (f) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Buildings; (g) all of Seller's right, title and interest, if any, in and to all easements, rights of way, privileges, servitudes, appurtenances and other rights, if any, running with Seller's interest in the Land; and (h) all right, title and interest of Seller in and to (i) the leases and occupancy agreements for space in the Building, and all guarantees thereof, as shown on the Rent Schedule (as hereinafter defined) and

1

all other licenses and agreements, if any, with respect to the use and occupancy of the Land or the Building, together with all amendments and modifications thereto and any guaranties provided thereunder (the "Leases") and the amounts deposited under any such Leases in the nature of security for the performance of any tenant obligations thereunder (the "Security Deposits"), the present value and list of which are set forth on the Rent Schedule; (ii) plans, specifications, architectural and engineering drawings, prints, surveys, soil and substrata studies relating to the Land and the Building in Seller's possession; (iii) all operating manuals and books, data and records regarding the Land and the Building and its component systems in Seller's possession; (iv) all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Land and the Building to the extent that they may be transferred or assigned, (v) all warranties or guaranties, if any, applicable to the Building, to the extent such warranties or guaranties are assignable; and (vi) all tradenames, trademarks, servicemarks, logos, copyrights and good will relating to or used in connection with the operation of the Land and the Building (the foregoing (a) through (h) being hereinafter collectively referred to as the "Premises"). The Premises are located at and known as: 605 Greenlake Road, Athens, New York 12414 (SBL ___). No new Leases will be entered into by Seller following the date of this Contract without the prior written consent of Purchaser.

1.02    Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this Contract, subject only to the matters set forth in Schedule B attached hereto (collectively "Permitted Exceptions").

**2.       Purchase Price, Acceptable Funds, Escrow of Down Payment and Foreign Persons**

2.01    The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule "C" attached hereto is Four Million Dollars only

2

($4,000,000.00).

(a)  **No Financing Contingency**. Purchaser acknowledges and agrees that this purchase and Purchaser's obligations to close are expressly NOT contingent on Purchaser's ability to secure debt, equity or other financing or funds and that the Contract is expressly NOT contingent on same; provided, however, nothing herein shall preclude Purchaser from obtaining financing for the acquisition of the transaction contemplated herein.

2.02   All monies, other than the Down Payment, payable under this Contract, unless otherwise specified in this Contract, shall be paid, at Purchaser's election, by (a) bank checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, (b) official bank checks drawn by any such banking institution, except that uncertified bank checks of Purchaser payable to the order of Seller totaling no more than $1,000.00 shall be acceptable for sums payable to Seller at the Closing, or (c) by wire transfer of immediately available federal funds to an account designated by Seller not less than three (3) business days prior to the Closing.

2.03   (a) The sum paid under paragraph (a) of Schedule "C" or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Down Payment") shall be paid by wire transfer of immediately available federal funds to the escrow account of Seller's attorney Berger, Fischoff, Shumer, Wexler, Goodman, LLP (the "Escrowee"), and the Escrowee shall hold the proceeds thereof in escrow in an IOLA interest-bearing account located in Chase Bank (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing (as hereinafter defined) or sooner termination of this Contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee need not hold such proceeds in an interest-

bearing account, but if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any taxes due thereon. The tax identification numbers of the parties are either set forth in Schedule "D" or shall be furnished to Escrowee upon request. At the Closing, the Down Payment and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of the Down Payment, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within ten (10) business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such ten (10) business day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold the Down Payment until otherwise directed by written instructions from the parties to this Contract or a final non-appealable judgment of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Down Payment and interest thereon, if any, with the Clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder. (b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee, shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of

4

Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contract or involving gross negligence on the part of Escrowee. (c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this Contract.

2.04    In the event that Seller is a "foreign person", as defined in Internal Revenue Code Section 1445 and regulations issued thereunder (collectively, the "Code Withholding Section"), or in the event that Seller fails to deliver the certification of non-foreign status required under Section 10.12(c), or in the event that Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price, a sum equal to ten (10%) percent thereof and shall at Closing remit the withheld amount with Forms 8288 and 8288A (or any successors thereto) to the Internal Revenue Service; and if the cash balance of the Purchase Price payable to Seller at the Closing after deduction of net adjustments, apportionments and credits (if any) to be made or allowed in favor of Seller at the Closing as herein provided is less than fifteen (15%) percent of the Purchase Price, Purchaser shall have the right to terminate this Contract, in which event Escrowee shall refund the Down Payment to Purchaser and shall reimburse Purchaser for title examination and survey costs as if this Contract were terminated pursuant to Section 13.02. The right of termination provided for in this paragraph shall be in addition to and not in limitation of any other rights or remedies available to Purchaser under applicable law.

**3.    The Closing**

3.01    Except as otherwise provided in this Contract, the closing of title to the Premises pursuant to this Contract (the "Closing") shall take place on the scheduled date and time of closing specified in Schedule "D" (the actual date of the Closing being herein referred to as

**4.    Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follows, which representations shall be true as of the date hereof and will be true as of the date of Closing:

4.01    Seller is the sole fee owner of the Premises and has not granted any option to purchase the Premises or any right of first refusal or right of first offer to purchase the Premises;

4.02    The information concerning the Lease – No Leases.

4.03    If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein, or if no date is set forth therein, as of the date hereof. There are no Service Contracts to be assumed by Purchaser or that will be binding upon Purchaser after Closing;

4.04    The Purchaser takes the property subject to all or future violations after the date of Closing. Notwithstanding the foregoing, Seller will pay all fines and penalties associated with violations of record which predate the Closing;

4.05    There is no litigation pending or threatened with respect to the Premises.  It will be a condition of Closing that no such action or proceeding is pending as of the date of Closing that could adversely affect title to, use or occupancy of the Premises after Closing. Notwithstanding the foregoing, for an avoidance of doubt;

4.06    Seller is not a "foreign person" as defined in the IRC Withholding Section.  This representation shall survive Closing;

4.07.    Seller represents that there are no leasing commissions or unpaid installments thereof due or owing to any person with respect to any of the Leases (including renewals, extensions or expansions in connection therewith) and, if any, Seller shall pay same at or prior to

Closing;

4.08.    Except as otherwise set forth in Schedule "D", Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises and there have been no special assessments levied, assessed or imposed against the Land, Building or Improvements and no public improvements of any kind have been constructed or a plan with respect to or in the vicinity of the Land, Building or Improvements which has or shall result in the imposition of the special assessment or other lien against the Land, Building or Improvements;

4.09.    Seller is not, and will not become, a Prohibited Person (as defined below).  None of Seller's investors, affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Contract is a Prohibited Person.  The assets Seller will transfer to Purchaser under this Contract are not the property of, and are not beneficially owned, directly or indirectly, by a Prohibited Person.  The assets Seller will transfer to Purchaser under this Contract are not the proceeds of specified unlawful activity as defined by 18 U.S.C. §1956(c)(7). For purposes hereof, a "Prohibited Person" means any of the following:  (i) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "Executive Order"); (ii) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (iv) a person or entity that is otherwise the target of any economic sanctions program currently administered by

OFAC; or (v) a person or entity that is affiliated with any person or entity identified in any of clauses (i), (ii), (iii) and/or (iv) above;

4.10. Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby. Assuming due authorization, execution and delivery by Purchaser, this contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

4.10 (a) The Seller's obligation to consummate this transaction is subject to and conditioned upon the Seller obtaining an order of the Bankruptcy Court for the Eastern District of New York (Case No: 22-42032) in connection with the pending voluntary Chapter 11 reorganization proceeding filed by the Seller on August 26, 2023 a) ratifying the Seller's authority to execute this Contract and  b) authorizing the Seller to consummate the sale in accordance with the terms and conditions of this Contract.

4.11. The execution and delivery of this contract and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of Seller's assets or property which would materially and adversely affect the ability of Seller to carry out the terms of this contract. Seller has obtained all consents, approvals, authorizations or

orders of any court or governmental agency or body required for the execution, delivery or performance by Seller of this Contract;

4.12.    There are no pending proceedings or appeals to correct or reduce the assessed valuation of the Premises;

4.13.    There are no employees currently employed by Seller at the Premises who will remain employed following the Closing Date.  There are no collective bargaining or union agreements in effect with respect to the Premises or to which Seller is a party and there is no pension, profit-sharing, insurance or other employee benefit plans to which Seller is a party or by which the Premises is bound.  Seller has paid or shall pay on or before the Closing Date all sums due for the period prior to the Closing Date for wages, utilities, all fees pursuant to any Service Contracts, management agreements or other agreements affecting the Premises;

4.14.    To the best of Seller's knowledge, there are no condemnation proceedings with respect to the Premises and Seller has not received written notice of any pending or threatened condemnation proceedings with respect to the Premises;

4.15.    Seller (i) is a limited liability company duly formed and in good standing under the laws of the State of New York; (ii) has all requisite power and authority to enter into this Contract and to consummate the transactions contemplated hereby; and (iii) has full power and authority to enter into and perform this Contract and to enter into the documents to be executed and delivered in accordance with the terms hereof, which, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally);

4.16.    Seller is not subject to any pending voluntary or involuntary reorganization,

liquidation, receivership, or other proceedings under any federal, state or local insolvency, liquidation, reorganization or similar type laws; except as set forth in Section 4.10(a).

4.17.    Seller has not applied and has not consented to any Tenant applications to amend the certificate or certificates of occupancy for the Premises. Seller has not applied to any agency seeking to designate the Premises or any part thereof as having landmark status;

4.18.    All bills and claims for labor performed and materials furnished at the Premises by or for the benefit of Seller have been paid, and if not paid, shall be paid in full on the Closing Date;

4.19.    To the Seller's knowledge, there is no Hazardous Substance on or in the Premises, whether contained in barrels, tanks, equipment (moveable or fixed) or other containers, deposited or located in land, waters, sumps or in any other part of the site, incorporated in any structure on the Premises or otherwise existing thereon. As used herein, "Hazardous Substance" means any substance which listed as "hazardous" or "toxic" in the regulations implementing the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Section 6901 et seq., or under applicable New York law;

4.20.    Inapplicable. To the best of Seller's knowledge, no work has been done upon the Premises by the City of New York and that City has not demanded that any work be performed which would result in charges by the New York City Emergency Repair Service nor is there any unpaid charge for Emergency Repair Service, nor for water tap closing charges, nor for Hazardous Substance emergency response. Seller will provide an affidavit at Closing stating that the foregoing is accurate. Such affidavit is intended to be relied upon by the Purchaser and the Title Company; and

4.20.    Seller is in compliance with all applicable Anti-Money Laundering Laws (as hereinafter defined), including the reporting, record keeping and compliance requirements of the Anti-Money Laundering Laws, and has policies, procedures, internal controls and systems that are reasonably designed to ensure such compliance, and Seller  (x) is not under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes that in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws, (y) has not been assessed civil or criminal penalties under any Anti-Money Laundering Laws or (z) has not  had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.  For purposes of this Agreement, "Anti-Money Laundering Laws" shall mean all laws, rules, regulations and sanctions, state and federal, criminal and civil, that:  (i) limit the use of or seek the forfeiture of proceeds from illegal transactions; (ii) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (iii) require identification and documentation of the parties with whom a financial institution conducts business; and/or (iv) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include, without limitation, the USA PATRIOT Act of 2001, Pub. L. No. 107-56, the Bank Secrecy Act, 31 U.S.C. Section 5311 et seq., as amended by The International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, as well as laws, rules and regulations relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957 and all other authorizing

statutes, executive orders and regulations administered by OFAC, and related Securities and Exchange Commission, self-regulating organizations and other agency rules and regulations.

## 5.    Acknowledgments of Purchaser

5.01    Purchaser has inspected the Premises, is fully familiar with the physical and environmental condition and state of repair thereof, and, subject to the provisions of Sections 7.01, 8.01, and 9.04 and except as otherwise expressly provided herein, shall accept the Premises, including but not limited to all electrical, heating and plumbing systems, the roof, environmental issues and basement, "As Is" physical condition and in their present state and condition, but in working condition at Closing subject to reasonable use, maintenance, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this Contract.

5.02    Purchaser acknowledges and agrees that, except as expressly provided elsewhere in this Contract, neither Seller nor broker, nor any employee, representative or agent of either of them, nor any other person, has made and does not make, and Purchaser specifically disclaims, any representations, warranties promises covenants agreements or guaranties of any kind or character whatsoever, whether express or implied oral or written, past present or future of as to concerning or with respect to (a) the nature, quality or condition of the Premises including without limitation, its water, soil and geology, (b) any income to be derived from, or costs or expenses with respect to or the value of the Premises, (c) the suitability of the Premises for any and all activities or uses which Purchaser may intend to conduct herein, including any future development of or change in use of or the continuation of any existing use of, the Premises, (d) the compliance of or by the Premises or its operation with any laws, (E) the presence or absence of hazardous materials at, under or adjacent to the property or any other environmental matter or condition of the Premises,

or (F) all present and future laws, ordinances, codes, orders, restrictions and regulations (including without limitation, zoning building and environmental laws ordinances codes restriction and regulations of all Federal state municipal or other governmental departments, Authorities or other entities having jurisdiction over the Premises and the use thereof .

    5.03    Purchaser acknowledges and agrees that Purchaser has inspected and investigated to its satisfaction the Premises and all of the foregoing matters, and all other matters, that it desired to inspect and investigate and that it is fully aware of, and expressly agrees to accept the Premises subject to all of the foregoing and that the sale of the Premises is on an as is, where is condition and basis, with all faults (subject to ordinary wear and tear and damage by the elements and any casualty event), without any warranties, express or implied. Upon closing of title, except as expressly set forth herein, and any other provisions of this Contract which expressly survive the Closing, Purchaser will be deemed to assume all of Seller's prospective obligations with respect to the Premises.  This section shall survive the Closing or any termination of this Contract.

    5.04    If a Certificate of Occupancy, Certificate of Use or Municipal code compliance Certificate is required to be obtained in order for the Premises to be transferred to or occupied by Purchaser, Purchaser shall obtain such Certificate of Occupancy, Certificate of use or municipal code compliance certificate at Purchaser 's sole cost and expense. If any violations at the Premises shall be required to be corrected by the municipality or other work performed at the Premises to obtain a Certificate of Occupancy, Certificate of Use or Municipal Code Compliance certificate, Purchaser shall correct and or perform same, provided, however, it shall be at Seller's sole cost and expense to pay for any penalties associated with the violations. Seller makes no representation as to whether a Certificate of Occupancy, Certificate of Use or Municipal Code Compliance Certificate is required or whether the Premises may be occupied or used by Purchaser.

5.05    Except as otherwise provided herein, Purchaser for itself and for its heirs, successors, and assigns, hereby waives all of its rights under this Contract (if any) and any environmental laws to require Seller to remediate or clean up the Premises. Purchaser acknowledges having inspected the Premises, having observed its physical characteristics and existing conditions and having had the opportunity to conduct such investigation and study on and of said Premises and hereby waives any and all objections to or complaints regarding including but not limited to Federal, State or Common law based actions and any private right of action under State and Federal law to which the Premises is or may be subject including but not limited to CERCLA and RCRA, physical characteristics and existing conditions including without limitation structural and geologic conditions and subsurface soil and water conditions. This section shall survive the Closing.

## 6.    Seller's Obligations as to Leases

6.01    Unless otherwise provided in the schedule attached to this Contract, between the date of this Contract and the Closing, Seller shall not, without Purchaser's prior written consent: (a) amend, renew or extend any Lease in any respect, unless required by law; (b) grant a written lease to any Tenant occupying space pursuant to a Tenancy; (c) terminate any Lease or Tenancy except by reason of a default by the Tenant thereunder (provided that Seller shall provide Purchaser with written notice of same immediately upon such termination); or (d) consent to an assignment of a Lease or the subletting by any Tenant, except as required by law.

6.02    Unless otherwise provided in the schedule attached to this Contract, between the date of this Contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant.

6.03    If any space is vacant on the Closing Date, Purchaser shall accept the Premises

subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this Contract. Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent in Purchaser's sole discretion. Seller shall not apply all or any part of the Security Deposit of any Tenant unless such Tenant has vacated the Premises.

6.04    Except as otherwise provided in this Contract, Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the Tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the Tenant's default shall not affect the obligations of Purchaser under this Contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

7.    **Responsibility for Violations**

7.01    Except as provided herein, Purchaser agrees to purchase the Premises subject to all notes or notices of violations which were known to be noted or issued after the date of this Agreement, and prior to the date of Closing, by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises prior to the Closing Date (collectively, "Violations"), except that Seller shall pay all liens, monetary fines, penalties, charges, interest and sums related to the Violations which have attached to the Premises at the time of Closing and all other matters which can be cured by the payment of money, at or prior to or at Closing shall be removed or complied with by Purchaser. Purchaser accepts the building subject to any violations or other notices issued by any governmental agency or unit having jurisdiction over the Property after date of contract of sale. Seller has no obligation to cure any violations, notice of violations etc. but will pay any outstanding fines or penalties incurred prior to the

date of this Contract.

7.02.    Intentionally Omitted.

7.03.    Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure to remove or fully comply with any violations which a Tenant is required to remove or comply with pursuant to the terms of its Lease by reason of such Tenant's use or occupancy shall not be an objection to title. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except Seller will pay for any open fines and penalties related thereto.

7.01.    If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of Violations have been noted or issued with respect to the Premise or liens have attached thereto.

## 8.    Destruction, Damage or Condemnation

8.01.    Damage by Casualty.

(a)    Damage Not in Excess of $100,000.  If, prior to the Closing Date, there shall occur damage to any one or more of the individual property comprising the Premises caused by fire or other casualty which would cost less than ten (10%) percent of such individual property's Allocated Price, but in no event more than $100,000 in the aggregate (the "Casualty Threshold") to repair, as reasonably determined by an engineer selected by Seller and reasonably satisfactory to Purchaser, and such fire or other casualty does not adversely affect the building-wide systems, or common areas and the continued operation of the balance of the Premises not damaged and does not give rise to rent abatement, then Purchaser shall not have the right to terminate this Contract

16

by reason thereof, but Seller shall assign to Purchaser at the Closing, by written instrument in form and substance reasonably satisfactory to Purchaser, all of the insurance proceeds payable on account of any such fire or casualty, shall deliver to Purchaser any such proceeds actually paid to Seller, and shall afford to Purchaser at Closing a credit against the balance of the Purchase Price in an amount equal to any deductible. If the limit of Seller's insurance policy with respect to a casualty at the Premises is less than the cost of restoration, then Purchaser shall be entitled to a further reduction in the Purchase Price in an amount equal to the difference between the cost of restoration and the limit of such insurance policy (less the deductible). The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

(b)     Damage in Excess of $100,000.  If prior to the Closing there shall occur damage to the Premises caused by fire or other casualty which would cost an amount equal to the Casualty Threshold or more to repair, as reasonably determined by an engineer selected by Seller and reasonably satisfactory to Purchaser, or the damage affects the building-wide systems, or common areas or the continued operation of the balance of the Premises not damaged or gives rise to rent abatement, then Purchaser may elect to terminate this Contract by notice given to Seller and Escrowee within ten (10) days after Seller has given Purchaser notice that such damage occurred, or at the Closing, whichever is earlier, upon which termination, Escrowee shall deliver the Down Payment (and any interest earned thereon) to Purchaser, this Contract shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for those obligations and liabilities that are expressly stated to survive termination of this Contract. If Purchaser does not elect to terminate this Contract, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the

Closing, by written instrument in form reasonably satisfactory to Purchaser, all of the insurance proceeds payable on account of any such fire or casualty, shall deliver to Purchaser any such proceeds or awards actually paid to Seller, and shall afford to Purchaser at Closing a credit against the balance of the Purchase Price in an amount equal to any deductible. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

(c)    Seller agrees not to repair any damage to the Premises (other than emergency repairs) without Purchaser's prior written consent and not to incur Reimbursable Amounts totaling in the aggregate in excess of $2,500 without Purchaser's prior written consent. Purchaser shall have the right to participate in any discussions, claims adjustments or settlements with insurance companies regarding any damage to the Premises.

(d)    The term "Reimbursable Amounts" shall mean costs and expenses actually and reasonably incurred by or for the account of Seller in connection with fire or other casualty for (x) compliance with governmental ordinances, orders or requirements of any governmental department, agency or bureau having jurisdiction of the Premises, (y) safeguarding the Premises or any part thereof, including any protective restoration or (z) emergency repairs made by or on behalf of Seller (to the extent Seller has not theretofore been reimbursed by its insurance carrier).

8.02.    Condemnation.    If after the execution and delivery of this Contract and prior to Closing Date, any proceedings are instituted by any governmental authority which shall relate to the proposed taking of all or any portion of the Premises by eminent domain, or if any such proceedings are pending on the date of execution and delivery of this Contract, or if all or any portion of the Premises is taken by eminent domain after the date of this Contract and prior to the

Closing, Seller shall promptly notify Purchaser in writing no later than two business days after Seller's receipt of any notification or the date of Closing, whichever occurs earlier. Purchaser shall thereafter have the right and option to terminate this Contract by giving written notice to Seller and Escrowee within thirty (30) days after receipt by Purchaser of the notice from Seller or on the Closing Date, whichever is earlier. If the Closing Date was scheduled to occur after the institution of such proceeding, the Closing Date shall be deemed adjourned in order that Purchaser shall have its full thirty-day period within which to determine whether or not to proceed with Closing. If Purchaser timely terminates this Contract, Purchaser shall be entitled to receive the Down Payment, together with any interest earned thereon, from Escrowee and this Contract shall thereupon be terminated and become void and of no further effect, and neither party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except for those obligations and liabilities that are expressly stated to survive termination of this contract. If Purchaser does not elect to terminate this Contract, the parties hereto shall proceed to the Closing and at the Closing, Seller shall assign to Purchaser all of its right, title and interest in all awards in connection with such taking and shall pay to Purchaser any award paid to Seller with respect to such taking. Purchaser shall have the right to participate in discussions or proceedings with any governmental authority relating to the proposed taking of any portion of the Premises.

9.    **Covenants of Seller**

Seller covenants that between the date of this Contract and the Closing:

9.01.    Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminable without penalty upon not more than 30 days' notice by the then owner of the Premises or prior to the Closing Date. There are no Service Contracts to be assumed by Purchaser and there will be none at Closing.

9.02.    No fixtures, equipment or personal property included in this sale shall be removed from the Premise unless the same are replaced with similar items of at least equal quality prior to the Closing.

9.03.    Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real Estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the reasonable expenses of collection thereof, which obligation shall survive the Closing. Notwithstanding the foregoing, Seller represents that there are no such tax contests currently pending.

9.04.    Seller shall allow Purchaser or Purchaser's representatives or its lender and architects and other inspectors access to the Premises, the Leases and other documents required to be delivered under this Contract upon reasonable prior notice at reasonable times.

9.05.    Seller shall continue to operate the Premises in the same manner as prior to the date hereof and shall continue to maintain and repair the Premises in accordance with past practices to maintain the Premises in the same condition as of the date hereof, normal wear and tear excepted.

9.06.    Seller shall maintain in full force and effect until the Closing Date all insurance policies affecting the Premises.

9.07.    Seller shall continue to perform all of its obligations as landlord under the Leases. Seller shall promptly notify Purchaser of any default under any Lease or the receipt of any notice of default from any Tenant and of any change relating to the information shown on the Rent

Schedule. Seller shall commence to cure any default on the landlord's part under the Leases prior to the Closing Date.

**10.    Seller's Closing Obligations**

At the Closing, Seller shall deliver the following to Purchaser:

10.01. A statutory form of bargain and sale deed with covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title of each property required by this Contract to Purchaser.

10.02. Not applicable. All original Leases and any amendments, extensions or renewals thereof and all other documents in Seller's possession and/or control , and to the extent not, copies thereof, certified by Seller as true, correct and complete and DHCR registration statements, to the extent in Seller's Possession, and Tenant deregulated building files including any invoices related to apartment improvements and deregulated units along with all relevant tenant and building files to the extent in Seller's possession.

10.03    Not applicable. An assignment and assumption of the Leases, to be executed by Seller and Purchaser, which shall contain  (i) an indemnity by Purchaser in favor of Seller from and against any and all claims, liabilities, damages and expenses (including reasonable attorneys' fees) arising or accruing under any of the Leases from and after the Closing Date, in the form attached hereto as Exhibit "A", which shall include an assignment and assumption of all security deposits, with a schedule of all security deposits attached thereto and a  credit to Purchaser in the amount of any security deposits, including any interest thereon, if any, required to be held by Seller on the Closing Date and appropriate instruments of transfer or assignment with respect to any security deposits which are other than cash.

10.04  Not applicable. An updated the Rent Schedule including arrears, if any,  and any

prepayments of rent, if any, certified by Seller as true and correct as of the Closing Date.

10.05  Intentionally Omitted

10.06  Not applicable.  An assignment to Purchaser, without recourse or warranty, of all the interest of Seller in those, insurance policies, if applicable, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller. An assignment of all arrears, subject to apportionment.

10.07 Not applicable.  Tenant or Seller's Estoppel Certificates reasonably acceptable to Purchaser's lender for all commercial tenants, if any, only evidencing that the Leases are not in default, the rental due, the expiration date of the lease, security deposit, if Tenant is current, if any options to buy or rights of first refusal, that Lease is subordinate to the mortgage, if there are any renewal options and if any known landlord defaults exist and such other terms reasonably required by Purchaser or Purchaser's Lender.

10.08 To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

10.9. Such affidavits as Purchaser's Title Company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name and such other items typically included in title affidavits plus all invoices, work permits and agreements related thereto.

10.10(a). Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, (b)

the Tentative Assessment and Return or Statement of No Tax Due or affidavit (whichever is applicable) and the checks and other items (if any) required under Section 17.09(a), and (c) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury. Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

10.11   Not applicable.  To the extent they are then in Seller's possession or control, copies of tenant files.

10.12.  Not applicable.  An original letter, executed by Seller or by its agent, in a form to be approved by Purchaser prior to Closing, advising the Tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

10.13.  If Seller is a corporation or a Limited Liability Company all necessary consents and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors or manager authorizing the sale and delivery of the deeds and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deeds referred to in Section 10.01 shall also contain a recital sufficient to establish compliance with such law.

10.14.  Possession of the Premises in the condition required by this Contract, subject to the rights of tenants, as tenants only, with no option to purchase, right of first refusal or right of first offer, and delivery of all keys and alarm codes.

10.15   Any other documents required by this contract to be delivered by Seller.

10.16   An assignment of all rights, title and interest of Sellers in and to the certificates,

permits, approvals and other documents to be delivered to Purchaser at the Closing which are then in effect with respect to the Premises and are assignable by Seller.

10.17   A bill of sale transferring all personal property included in the sale free and clear of any and all liens, notwithstanding that no portion of the purchase price has been attributed thereto.

10.18.   A certificate of Seller confirming that the warranties and representations of Seller set forth in this Contract are true and complete on and as of the Closing Date (the statements made in such certificate shall be subject to the same limitations on survival as are applicable to Seller's representations and warranties under section 4).

## 11.    Purchaser's Closing Obligations

At the Closing, Purchaser shall:

11.01.   Deliver to Seller wire(s) in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 13.

11.02. A purchase money mortgage in the amount of $900,000.00, payable in monthly installments of interest only at 7% P.A. for 17 months with a balloon payment of all accrued interest and principal due on the 18th month. Purchaser shall pay all costs associated with the mortgage including preparation of the mortgage, title insurance in Seller's favor, recording, including a legal fee of $2,500.00 to Seller's attorney.

11.03.   Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under Section 10.03.

11.04.   Cause the deeds to be promptly recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered

to the appropriate officers promptly after the Closing. Seller shall pay all of the applicable NYC and NYS transfer taxes.

11.05.  If Purchaser is a corporation or a Limited Liability Company, all necessary consents and if required by Section 909 of the Business Corporation Law, a resolution of Purchaser's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Purchaser certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in Section 10.01 shall also contain a recital sufficient to establish compliance with such law.

11.06.  Deliver any other payments, if any, required by this Contract to be delivered by Purchaser.

11.07.  Deliver such certification on affidavits certifying that neither Buyer nor any principal or any other party that has ownership in or control over Buyer thereof is (i) listed on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control, Department of the Treasury (or other lists of similar import) or is in violation of, under investigation by any governmental authority for, or has been charged with or convicted of violating, any antiterrorism or anti money laundering laws, order, rules or regulations, or has been notified that any of its or their assets have been frozen by any governmental authority, or (ii) a person with whom Seller is prohibited from engaging in this transaction due to any United States government embargos, sanctions, or the foregoing or any other terrorism or money laundering laws and shall deliver such forms as are reasonably necessary and required.

## 12.    Conditions Precedent to Closing

12.01 Subject to the terms of this Contract, Purchaser shall have no obligation to consummate the transaction contemplated herein at the Closing unless:

12.01   All of Seller's representations as set forth in Section 4 hereof are true and correct in all material respects on the Closing Date, and Seller shall have performed and complied with all covenants, agreements and conditions required by this Contract to be performed or complied with by Seller on and as of the Closing Date.

12.02   The Title Company shall be prepared to issue an ALTA 2006 Owner's Policy to Purchaser pursuant to which the Title Company shall insure title to the Premises in accordance with such standard form policy, at standard rates, subject only to the Permitted Exceptions.

12.03 Purchaser shall have received all of Seller's Closing Documents (as set forth in Section 10 hereof).

**13.    Apportionments**

13.01   The following apportionments shall be made between the parties at the Closing as of 11:59pm on the day prior to the Closing Date including all:

(a)    Rent, prepaid rents and Additional Rents (as defined in Section 13.03);

(b)    Intentionally omitted;

(c)    real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on a final water meter reading obtained by Seller, at Seller's sole cost and expense, dated not more than fourteen (14) days prior to the Closing Date, subject to re-adjustment after the Closing when the next reading is available. Seller shall provide the Title Company at the Closing an indemnity requested by the Title Company to omit any exceptions in Purchaser's title commitment with respect to water charges relating to the period prior to the Closing Date (this shall survive the closing);

(d)    intentionally omitted;

26

(e)    value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes; based on reading within 48 hours of Closing.

(f)    any other items to the extent such matters are customarily apportioned in connection with real estate closings of commercial properties in the City of New York.

(g)    If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

13.02    If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a) first to month of closing; (b) next to any months following the month in which the Closing occurred; (c) third to the period prior to the month in which the Closing occurred; and (d) the balance, if any, to Purchaser. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

13.03    If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable

attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing. Any Additional Rents due from tenants will first be credited to amount due Purchaser and provided same is paid current to Purchaser and tenants remain current with Purchaser, any Additional Rents collected will then be applied to any arrears, if any, owed by such tenants. Seller will order and obtain a final title meter reading prior to closing and, if applicable, DEP frontage reconciliation.

**14.    Objections to Title, Failure of Seller or Purchaser to Perform and Vendees' Lien**

14.01    Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be promptly forwarded to Seller's attorney after receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days in the aggregate to remove any defects or objections to title which may be disclosed on or prior to the Closing Date.

14.02    If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this Contract, except for Seller's willful default, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey with a credit against the monies payable at the Closing equal to the reasonable estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this Contract and the sole liability of Seller shall be to cause Escrowee to refund the Down Payment (together with interest thereon, if any) to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's Title Company therefore without issuance of a policy, and survey cost, if any and all actual out-of-pocket costs incurred by Purchaser in connection with its due diligence, including, but not limited to, reasonable attorneys fee. Upon

such refund and reimbursement, this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14.01 or as otherwise expressly provided herein to survive the termination of this Contract. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D  (the "Maximum Expense") to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract. . Nothing herein shall be construed to limit Seller's obligation to pay at or prior to closing in full all consensual liens, open mortgages, known monetary liens, real estate taxes, water/sewer charges and actual charges, and/or to provide customary documents required to be delivered pursuant to the Contract.

14.03   Any unpaid taxes, water charges and sewer rents, together with the interest and penalties thereon to a date not less than oneday following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record and the Title Company duly omits from its title policy any exceptions therefore. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with Section 2.02.

If Purchaser shall materially default in the performance of its obligation under this Contract to purchase the Premises, the sole and exclusive remedy of Seller shall be to retain the Down

Payment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain. If Seller shall willfully default under this Contract, Purchaser shall be entitled to all remedies available at law and in equity, including; without limitation, specific performance.

14.04  Purchaser shall have a vendee's lien against the Premises for the amount of the Down Payment, but such lien shall not continue after default by Purchaser under this Contract beyond any applicable notice or cure period, together with all other remedies at law. If Seller shall default in the performance of Seller's obligations under this Contract, the Purchaser shall be entitled to either (a) terminate this Contract and received a refund of the Down Payment, together with interest earned thereon, if any, and a reimbursement of title  survey, , or (b) seek specific performance of Seller's obligations hereunder. Notwithstanding the immediately preceding sentence, in the event remedy of specific performance is not an available, Purchaser shall have all other remedies available to it in law and/or equity.

## 15.    Broker

15.01. Except as otherwise provided herein, Seller and Purchaser represent and warrant that they have dealt with no broker in connection with this transaction other than Win Morrison Realty (the "Broker") and that neither Seller nor Purchaser knows of any other person or entity who has claimed or may have the right to claim a commission in connection with this transaction. The parties agree to indemnify and defend each other against any cost, expense, including reasonable attorneys' fees arising out of the breach of their respective parts of any representation contained in this paragraph. Seller shall pay the Broker the brokerage fee in accordance with a separate brokerage agreement. Purchaser shall indemnify Seller from any cost, expenses including legal fees and costs incurred by Seller in connection with any claim by any other brokers other

than the Broker to the extent Purchaser has dealt with another broker. Seller shall indemnify and hold Purchaser harmless, including reasonably legal fees, from any claims made by any other brokers who claim that they have dealt with Seller and are not referenced herein. This section shall survive the closing of title.

**16.    Assignment**

**17.    Notices**

17.02    All notices under this Contract shall be in writing and shall be delivered personally or by recognized national overnight carrier service or shall be sent by prepaid registered or certified mail, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided. Notices may be delivered via electronic mail except, time of the essence and default notices. Purchaser and Seller authorize their respective attorneys, as set forth in Schedule D, to send notices on their behalf.  All notices shall be deemed to have been duly given and received, whether or not actually received, on (a) the date of receipt if delivered personally, (b) seven (7) calendar days after the date of posting if transmitted by registered or certified mail, return receipt requested, (c) one (1) business day after the date sent by prepaid overnight courier with receipt acknowledged or (d) when transmitted by electronic mail, if following the giving of, pursuant to one of the other means set forth in this Section 16 before the end of the first business day thereafter.  Effective notice shall be deemed given only as provided above.

**18.    Limitations on Survival of Representation, Warranties, Covenants and other Obligations**

18.01    Except as otherwise provided in this Contract, no representations, warranties, covenants or other obligations of Seller set forth in this Contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

18.02   The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this Contract to survive the Closing.

**19.    Miscellaneous Provisions**

19.01   This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

19.02   This Contract shall be governed by, and construed in accordance with, the laws of the State of New York.

19.03   The captions in this Contract are inserted for convenience of reference only and in no way define, describe or limit the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

19.04   This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

19.05   This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

19.06   As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

19.07   All schedules and exhibits referenced in this Contract are incorporated herein and made a part hereof as fully is if set forth herein.  If the provisions of any schedule or exhibit to this Contract are inconsistent with the provisions of this Contract, the provisions of such schedule or exhibit shall prevail. Set forth in Schedule D is a list of any and all schedules and exhibits which are attached hereto.

19.08   A facsimile or scanned (PDF) fully executed copy of this Contract shall be deemed an original for all intents and purposes.

**20.   ASSIGNMENT OF MORTGAGE - OMITTED**

**21.   Assignment of Contract**.  Notwithstanding anything to the contrary set forth in this Contract, Purchaser shall have the right, on one occasion, to assign all of its right, title and interest under this Contract to (x) a corporation, partnership, limited liability company, trust or other entity under the control of, controlled by, or under common control with Purchaser; provided, however, that (i) such assignment shall be in writing; (ii) Purchaser's obligations under this Agreement shall be assumed in writing by the proposed assignee; and (iii) an executed counterpart of the assignment and assumption agreement shall be delivered to Seller at or prior to the Closing Date.

**22.   Reasonable Access**.  Between the date hereof and the Closing Date, Purchaser shall be afforded access to the Premises required by Purchaser in connection with its preparation for the Closing.  Purchaser agrees that in entering upon and inspecting or examining the Premises, it will not communicate with the Tenants or service providers without the prior written consent of the Seller to be given or withheld in the Seller's sole and absolute discretion.  Any access to the Premises must be upon written notice to Seller and during reasonable business hours, and (ii) at all times Purchaser and its representatives shall be accompanied by a representative of Seller when at the Property.  Purchaser agrees to indemnify against and hold Seller harmless from any claim

for liabilities, costs, expenses (including reasonable attorneys' fees actually incurred), damages or injuries arising out of or resulting from the inspection of the Premises by Purchaser or its agents and, notwithstanding anything to the contrary in this Contract, such obligation to indemnity and hold harmless Seller shall survive Closing or any termination of this Contract.

**23.    Seller Cooperation.**  Purchaser shall have the right from time to time prior to Closing to reasonably request that Seller provide information relating to the Premises at reasonable times concerning the general status of the operations relating to the Premises, but only to the extent such information is readily and reasonably available to the Seller or its property manager and in a format consistent with how the Seller maintains such information.

**24.    Due Diligence Period.**  Purchaser shall have seventy five (75) days from the date hereof to inspect the premises and all matters concerning the premises ("Inspection Period").   No inspections may be made by any building or zoning inspector or government employee without the prior written consent of Seller.  Purchaser may at anytime until the expiration of the Due Diligence Period in its sole and absolute discretion cancel the Contract by giving written notice prior to the expiration of the Due Diligence Period.  Upon cancellation this Contract will be null and void without further effect except for Seller to return the contract downpayment and the indemnification below.

Indemnification

Purchaser shall indemnify and hold Seller harmless from any claim, right or cause of action that may be alleged against it by reason of any entry onto the Premises by Purchaser, its agents, contractors or employees.  Prior to any entry onto the Premises by Purchaser, its agents, contractors or employees, Purchaser shall deliver to Seller a certificate of liability insurance in an amount and in form reasonably satisfactory to Seller insuring Seller from any claim, right or

34

liability that may be alleged against it by reason of such entry on the Premises. The provisions of this paragraph shall survive any termination of this contract.

Purchaser shall not permit any liens or encumbrances to be placed against the premises by reason of work or service done to or concerning the premises, or material or labor supplied to or in connection with the Premises, at the request of material or labor supplied to or in connection with the Premises, at the request of Purchaser or any employee, agent or contractor of Purchaser. Purchaser shall pay or otherwise discharge any such lien or encumbrance within fifteen (15) days notice from the Seller or Sellers attorney. The provisions of this paragraph shall survive any termination of this contract.

**[Signatures follow on next page.]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Contract as of the date first above written.

Seller: NYMD Greenlake, LLC

_____

By  , Managing Member

Purchaser: Konnectia, LLC

A nominee for an entity to be formed

_____

By:  **Jose Maria Softa**
**M360 Management LLC, Manager**

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $_____, by wire transfer subject to collection, to be held in escrow pursuant to § 2.05.

Berger, Fischoff, Shumer, Wexler & Goodman, LLP

By:_____
Name: Gary C. Fischoff
Title: Partner

**IN WITNESS WHEREOF,** the parties hereto have executed this Contract as of the date first above written.

Seller: NYMD Greenlake, LLC

LINCOLN A. GRAHAM JR

By , Managing Member, PRESIDENT

Purchaser: Konnectia, LLC

A nominee for an entity to be formed

By: _____, Managing Member

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $_____, by wire transfer subject to collection, to be held in escrow pursuant to § 2.05.

Berger, Fischoff, Shumer, Wexler & Goodman, LLP

By:_____
Name: Gary C. Fischoff
Title: Partner

1

Doc ID: e59199a9d299ad785f65b1478ae834bbe40b8961

Schedule A

DESCRIPTION OF PREMISES:

(to be attached separately and to include tax map designation)

## Schedule B

## PERMITTED EXCEPTIONS

1.     Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2.     Consents of record by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3.     Intentionally Omitted.

4.     Unpaid installments of assessments not due and payable on or before the Closing Date.

5.     (a)     Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

(b)     Minor Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises provided that the Title Company provides affirmative title insurance coverage over same at standard rates and without additional endorsement or premium and provided further such coverage shall be acceptable to Purchaser and Purchaser's lender.

(c)     Intentionally omitted.

(d)     Any state of facts that and accurate survey of the Premises would disclose, provided that such facts do not render title unmarketable or uninsurable at regular rates without

3

the payment of additional premium or endorsement, or prohibit or interfere with the existing use of the Premise or require the removal of any existing structures.

        (e)    Variations of less than one foot between recorded lines, fences, bushes and hedges, if any.

6.    The mortgage/deed of trust /deed to secure debt lien in connection with any Purchaser financing and any other matter created by or on behalf of Purchaser;

7.    Any laws, regulations, ordinances (including but not limited to zoning, land use, building and environmental) as to the use, occupancy, subdivision or improvement of the Premises adopted or imposed by any governmental body, which are not violated by the existing structures or present use of the Premises and which do not render title unmarketable or uninsurable at standard rates, without the payment of additional premium or endorsement; and

9.    Covenants, restrictions, and easements and other matters that do not materially impair the value of the Premises or the current use thereof and which are existing as of the date hereof, provided same shall not require the removal of any existing structures, or render title uninsurable at standard rates and without additional premium.

**Schedule C**

PURCHASE PRICE

The Purchase Price of $4,000,000.00 shall be paid as follows:

(a)     Upon execution of the contract by wire transfer to Escrowee's account, subject to collection, the receipt of which is hereby acknowledge by seller.

$15,000.00

(b)     Upon expiration of the Due Diligence Period          $385,000.00

(c)     Intentionally omitted.

(d)     At closing by check or wire(s) delivered to Seller at the Closing in accordance with the provisions of Section 2.02:

$3,600,000.00

**Schedule C-1**

**OMITTED**

Doc ID: a50100a0d300ad795f65b1470ac834bbc49b0064

Schedule D

MISCELLANEOUS

1.   Title insurer designated by Purchaser: To be determined.

2.   Intentionally omitted.

3.   Intentionally omitted.

4.   Intentionally omitted.

5.   Seller's tax identification number (Section 2.05):  45-5244891

6.   Purchaser's tax identification number (Section 2.05): to be provided to Escrowee

     upon request

7.   Scheduled time and date of Closing (Section 3.01):

     On or about sixty (60) days from the Due Diligence Expiration Date

8.   Place of Closing (Section 3.01): Seller's attorneys office – Berger, Fischoff,

     Shumer, Wexler & Goodman, LLP – 6901 Jericho Turnpike, Suite 230, Syoset,

     New York 11791, or remotely

     Intentionally omitted.

9.   Intentionally omitted.

10.  Intentionally omitted.

11.  Intentionally omitted.

12.  Maximum Amount which Seller will spend to cure violations, etc.,

          (Section 7.02): NONE

13.  Maximum Expense of Seller to cure title defects, etc.

     (Section 13.): None

14.  Broker, if any (Section 14.01):    Win Morrison Realty and Maximo Properties

     LLC

15.    Party to pay broker's commission (Section 14.01):    Seller

16.    Address for notices (Section 15.01)

If to Seller:

Lincoln Graham
155-15 90th Avenue
Jamaica, New York 11432

with copy to Seller's attorney:

Berger, Fischoff Shumer,
Wexler, Goodman, LLP
6901 Jericho Turnpike, Suite 230
Syosset, New York 11791
Attn: Gary C. Fischoff, Esq.
(516) 747-1136

If to Purchaser:

Konnectia, LLC
1915 Harrison Street, 2nd Floor
Hollywood, Florida 33020

with copy to Purchasers' attorney:

Mekhtiyev Law Firm P.C.1
110 West 40th Street
New York, New York 10018
Zulfiya Huseynova, Esq.
Phone: 212-203-6974
Email: zh@mekhlaw.com

18.    Additional Schedules or Exhibits (19.07):    None.

Schedule E

Rent Schedule

None

Schedule F

Court Proceedings

Chapter 11 Proceeding

Bankruptcy Court, Eastern District of New York

Case No: 22-42032

Exhibit A

ASSIGNMENT OF LEASES, RENTS AND SECURITY DEPOSITS

RIDER TO CONTRACT

BETWEEN NYMD GREENLAKE LLC AS SELLER

AND KONNECTIA LLC AS PURCHASER

Date: September 27th 2023

Property: 605-609 Greenlake Road, Catskill, New York 12414

It is agreed by the undersigned parties that the the property more particularly Section 103.00, Block 21, Lot 34 in the attached Scheduled A, shall be purchased by the Purchaser, from NYMD Project Greenlake LLC simultaneously with the closing for 605-609 Greenlake Road (Outparcel). The purchase of this property is subject to and conditioned upon the actual closing of the Sale of NYMD Greenlake LLC property.

1. The purchase price for the outparcel property shall be $70,000 cash at closing.

2. The property is being sold "as is" without any representations whatsoever including its zoning or use.

3. All of the terms of the Contract, except as otherwise modified herein remain in full force and effect.

SELLER:

NYMD Project Greenlake LLC

By: LINCOLN A. GRAHAM JR.

PURCHASER:

Konnectia LLC

By:   José María Softa

M360 Management LLC, manager

Doc ID: a014d1ec95a91f8f2d2561de04629db24fcc7d85

Doc ID: a014d1ec95a91f8f2d2561de04629db24fcc7d85

<u>SECOND RIDER TO CONTRACT</u>

<u>BETWEEN NYMD GREENLAKE LLC AS SELLER</u>

<u>AND KONNECTIA LLC AS PURCHASER</u>

Date: September _22nd_, 2023

<u>Property: 605-609 Greenlake Road, Catskill, New York 12414</u>

It is agreed by the undersigned parties that the above referenced contract shall be modified as follows:

1. Paragraph 24 of the Contract is omitted in its entirety.

2. Notwithstanding anything contained in the Contract otherwise, the property is being sold "as is" without any representations whatsoever including its zoning or use.

3. Schedule C of the Contract "Purchase Price" is modified as follows:

   Paragraph (b) is deleted and updated as follows: Thirty days after the date of this Rider, the Contract Deposit shall be increased to $100,000.

   If the closing does not occur within 30 days of Bankruptcy Court approval the Contract Deposit shall be increased to $400,000.

4. Seller shall submit a motion to court for approval of the Contract no later than September 27, 2023 and submit proof of the same to Purchaser.

5. Schedule D-7-Time of closing shall be modified to: Closing shall occur on or before 60 days of Bankruptcy Court approval.

6. All of the terms of the Contract, except as otherwise modified herein remain in full force and effect.

SELLER:

NYMD Greenlake LLC

By:  Lincoln A Graham Jr

PURCHASER:

Konnectia LLC

By:  José María Sofía

M360 Management LLC, manager